**DECLARATION**

I, Khrystina Pindle, Special Agent with the Drug Enforcement Administration, submit this declaration in support of a complaint for forfeiture of $39,000.00, seized from David Mackins at 1268 Gittings Ave, Baltimore, Maryland, 21239.

**Introduction and Agent Background**

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of United States Code Title 18.

2.       I have been employed with the United States Drug Enforcement Administration (DEA) as a Special Agent since May 2019. I am currently assigned to the Baltimore District Office, Strike Force Group 1, which investigates drug trafficking organizations ("DTO") and their ties to violence. As an SA of the DEA, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with the authority to execute arrest and search warrants under the authority of the United States. My training consisted of 16 weeks of Basic Agent Training at the DEA Academy in Quantico, Virginia. During that time, I received training in narcotics investigations to include physical and electronic surveillance techniques, legal statutes and procedures, money laundering techniques, asset identification, forfeiture and seizure, and confidential source management.

3.      Prior to my employment with the DEA, I was employed as an SA with the Federal Bureau of Investigation ("FBI") in San Francisco, California for approximately 15 months. Prior to my employment with the FBI, I was a Captain in the United States Army for eight years. During that time, I obtained a master's degree in International Relations from Webster University.

1

4.      During my time as a law enforcement officer, I have participated in multiple investigations involving drug trafficking to include the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, the execution of search and seizure warrants, and the recovery of substantial quantities of narcotics.

5.      Through training and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

6.      Through training, interviewing of dozens of persons arrested for controlled dangerous substance (CDS) offenses, watching hundreds of hours of surveillance of suspected drug traffickers, and monitoring of countless hours of intercepted communications involving drug trafficking, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. Based upon that training and experience, I have learned the following:

> a.  Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

2

b. Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

c. Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

d. Drug traffickers use cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

e. Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

f. Drug traffickers commonly possess packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

g. Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

## Purpose of This Declaration

7.     This declaration is submitted in support of a complaint for forfeiture *in rem* of $39,000 U.S. Currency (the "SUBJECT CURRENCY") seized from 1268 Gittings Ave, Baltimore, MD 21239 (the "GITTINGS PREMISES").

8.     I submit that there are sufficient facts to form a reasonable belief that the SUBJECT CURRENCY constitutes (1) moneys furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used or intended to be used to facilitate a violation of the Controlled

Substances Act in violation of 21 U.S.C. § 846 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

### Summary of the Investigation

9.      In May 2021, DEA Baltimore, Strike Force Group 1 ("SFG1") began investigating MACKINS based on information provided by DEA Pittsburgh.  DEA Pittsburgh has been investigating Frank MCCLELLAN for conspiring to distribute controlled dangerous substances ("CDS") and has obtained several search warrants relating to that investigation from the United States District Court for the Western District of Pennsylvania. Based on information provided by confidential sources, court-authorized collection of GPS data, and court-authorized intercepts over MCCLELLAN's wire and electronic communications on several cellular phones, DEA Pittsburgh is aware that MCCLELLAN travels to different cities to purchase CDS. Members of DEA Pittsburgh informed SFG1 that MCCLELLAN has been communicating with the user of the 929-234-1648 (referred to herein as the "SUBJECT TELEPHONE")[1] about conducting CDS transactions.

10.      SFG1 then identified MACKINS as the user of the SUBJECT TELEPHONE. First, the before-mentioned wire intercepts revealed that MCCLELLAN and MACKINS were planning to visit New York state prisoner Sampson Sanders ("Sanders") on April 28, 2021.[2] Visitor information for Sanders on April 28, 2021 showed that Sanders's only visitor on that date, other

---

[1] On June 10, 2021, United States Magistrate Judge A. David Copperthite authorized a warrant for information associated with cellular device with call number (929) 234-1648 that is controlled by Verizon wireless.

[2] Sanders was convicted in New York of criminal possession of a controlled substance and criminal possession of a firearm/weapon. Sanders is also known to investigators from a previous drug investigation documented through DEA in 1998, where he was convicted of possession with the intent to distribute cocaine. Sanders was also convicted in 1988 for distribution of cocaine in Massachusetts.

than MCCLELLAN, was MACKINS. Second, 929-234-1648 is registered in the name of Jeneen Hawkins, who is believed to be MACKINS's wife. Based on evidence gathered during that investigation, investigators determined that MACKINS and MCCLELLAN were associated with drug activity in violation of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Heroin) and other provisions of the Controlled Substances Act.

11.     As indicated above, based on my knowledge, training, and experience, I know drug traffickers commonly have phones subscribed in family members' or friends' names to hinder law enforcement efforts to track their whereabouts. Finally, law enforcement database CLEAR identifies the 929-234-1648 as being utilized by MACKINS. MACKINS was known to investigators from a previous drug investigation documented through the DEA in 1998. MACKINS was previously convicted for conspiracy and distribution of crack cocaine.

12.     Based on toll analysis, investigators learned that MACKINS is in contact with Nakia Green ("Green"). Green is known to investigators from a previous drug investigation documented through DEA in 2017. Green used wire transfer transaction numbers from inmates to collect money from narcotics transactions that her husband, Warren Green,[3] conducted inside prison. Visitor information for Warren Green on April 29, 2021 showed that MACKINS visited Warren Green at the same facility as Sanders.

13.     On May 1, 2021, MACKINS contacted MCCLELLAN at approximately 7:38 p.m. The following is a portion of the conversation:

**DIRECTION**                              **CONTENT**

---

[3] Warren GREEN is known to investigators from a previous drug investigation documented through DEA in 2017, where he was convicted of manslaughter and smuggling narcotics and weapons into prison.

| MCCLELLAN | Word. I didn't, I didn't get what I need to get, but I got enough. I got, I got um, uh four, so I'ma make my way to you. |
| MACKINS | Uh, hold on for a second, alright? |
| MCCLELLAN | Alright, but you gonna hit me back? |
| MACKINS | yeah |
| MCCLELLAN | You, you got-alright, yeah, yeah, yeah. |

14.     Based upon training, knowledge and experience, investigators believe MCCLELLAN arranged to purchase an unknown quantity of CDS from MACKINS. Investigators believe that MCCLELLAN subsequently traveled to the Baltimore, Maryland area to purchase a quantity of CDS from MACKINS.

15.     On May 2, 2021, at approximately 9:34 p.m., MCCLELLAN sent an outgoing text message to MACKINS, "here at tiger mart". Based on court-authorized GPS surveillance on MCCLELLAN's phone, coupled with the above text message referencing meeting at the Tiger Mart, investigations know that MCCLELLAN was in Baltimore, MD. Investigators believe the two met to engage in a CDS transaction.

16.     At approximately 10:00 a.m., MACKINS contacted MCCLELLAN again. Below is a portion of the conversations:

| DIRECTION | CONTENT |
| --- | --- |
| MCCLELLAN | Yo |
| MACKINS | Hey, bro boy, did you pulled up already? I got put something in your ear if you did. |
| MCCLELLAN | Oh yeah, I'm on the move |

| | |
|---|---|
| MACKINS | Alright, cool, that's cool. Yeah, but uh. Yeah, actually see, you know what im saying? Um, but don't send it on the land like that nigga, fuck it, you what I'm saying? |
| MCCLELAN | No, if I gotta bring it up, bring it |
| MACKINS | yeah |
| MCCLELLAN | Every, everything, everything be alright |
| MACKINS | Alright, cool. Year. Cause, you know what I'm saying? It should've been clean but on the land. Crazy. You know what I'm saying? |
| MCCLELLAN | yeah |
| MACKINS | Okay, cool. Just wanted to make sure, that's all that matters to me bro |
| MCCLELLAN | bet |
| MACKINS | Alright don't forget to hit me nigga |
| MCCLELLAN | alright |
| MACKINS | Alright. Love you boy |
| MCCLELLAN | Love you too boy |

17.     In the above conversation, MACKINS stated, "it should've been clean but on the land", which, based on training, knowledge and experience, investigators know is a reference to the quality of the CDS.

18.     On May 21, 2021, investigators observed MACKINS and Jeneen Hawkins exit GITTINGS PREMISES and enter a 2012 Ford F450 Super Duty, bearing Virginia registration UA20139, registered to JDM Transport LLC, 1900 S. Eads St, Apt 935 (hereinafter the "TARGET

VEHICLE"). MACKINS was seen carrying a large green shopping bag. Your affiant knows through training and experience that it is common for drug traffickers to transport CDS in various shopping bags. As previously mentioned, Jeneen Hawkins is married to MACKINS and GITTINGS PREMISES is their residence[4].

19.    On May 23, 2021, through a court ordered GPS cellular ping, investigators observed MCCLELLAN travel to a rest stop in Breezewood, PA. Additionally, investigators observed through a pen register order that MACKINS and MCCLELLAN were in contact. Based on historical GPS cellular ping data, MACKINS's phone (929-234-1648) was in Breezwood, PA on May 23, 2021. Investigators know that Breezewood, PA is the halfway point between Pittsburgh, PA and Baltimore, MD and is a meeting area often used by drug traffickers.

20.    On May 23, 2021, at approximately 10:12 a.m., Sanders made a recorded and monitored jail call from Five Points Correctional Facility in New York to MACKINS and the following was discussed:

| DIRECTION | CONTENT |
|---|---|
| MACKINS | I saw your man yesterday, Frank (U/I)[5] |
| SANDERS | Frank, Oh yeah he on his job. |
| MACKINS | Yeah.  I was up so mother fucking late. I went and brought the cars back. Then I had to pullover. Then I had to find my main man to ugh, cause I had drove one of the cars back, ugh I, I wanted to push |

---

[4] Based on a review of law enforcement databases, MACKINS placed a call to Baltimore City 911 on April 6, 2021, at 4:06 a.m., from 929-234-1648. MACKINS requested a uniformed officer to conduct a welfare check at the GITTINGS PREMISES. MACKINS stated, he was locked out of the house, his wife was inside and was not responding and he was concerned.

[5] [U/I] is commonly used by to describe words or phrases that are unidentifiable or cannot be understood.

|           |                                                                                                                                                                                                                                                                                          |
|-----------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|           | the mileage back up, you know what I'm saying?                                                                                                                                                                                                                                            |
| SANDERS   | Yeah                                                                                                                                                                                                                                                                                      |
| MACKINS   | But I didn't just want to leave this fucking car man that's how bad, That's just how bad I wanted that shit I drove that shit back that shit I didn't want to leave that shit. So I'm trying to see if he could possibly do it for me, hopefully he can. That's what I'm looking into now see if he can get that shit done for me. |
| SANDERS   | I just need to talk to you one more time that's it.                                                                                                                                                                                                                                      |

21.     Later during the call, Sanders asked if **MACKINS** would be going to "BK" (Brooklyn, N.Y.) and **MACKINS** stated he would be going there the next day. Sanders stated, "Try to hook up with my cousin Wayne and explain it to him." **MACKINS** affirmed and the call ended.

22.     Based upon training, knowledge and experience, investigators believe in the above conversation, **MACKINS**, stated, "I went and brought the cars back," investigators know that drug traffickers use the code term "cars" in lieu of "drugs" to avoid law enforcement detection.[6] **MACKINS** then told Sanders, "Then I had to find my main man to ugh, cause I had drove one of the cars back, ugh I, I wanted to push the mileage back up, you know what I'm saying?," which investigators believe that **MACKINS** took the CDS back to the source of supply in order to maximize the amount of CDS he previously had. Investigators believe that **MACKINS** was referring to his meeting in Breezewood, PA with MCCLELLAN when he stated, "I saw your man

---

[6] Investigators believe MACKINS does conduct some legitimate vehicle transporting under the business name "JDM transporting". Through training knowledge and experience, investigators know that individuals engaged in legitimate business often use those ventures to disguise illegitimate activity. Based upon investigators training knowledge and experience, Investigators believe this conversation was in reference to CDS activity not the legitimate business.

yesterday, Frank."

23.   On June 1, 2021, at approximately 3:11 p.m., **MACKINS** contacted

MCCLELLAN and the following was discussed:

| DIRECTION | CONTENT |
|---|---|
| MACKINS | Yo, big homie? |
| MCCLELLAN | Yo? |
| MACKINS | What up, boy? |
| MCCLELLAN | What's going on? |
| | |
| MACKINS | You sound sick, man. I gotta get you out the house somewhere, man. |
| MCCLELLAN | No, no. I'm cool. I'm, I'm doing what I do, you know? |
| MACKINS | Yeah |
| MCCLELLAN | I had a little issue, man |
| MACKINS | Oh, yeah? |
| MCCLELLAN | Yeah, I got some pictures I want you to see. |
| MACKINS | Okay, cool. |
| | |
| MCCLELLAN | Do you got a uh, a iPhone? |
| | |
| MACKINS | No, um... Uh.... no, I don't. |
| MCCLELLAN | Any, anybody close to you with a iPhone? |
| MACKINS | No, no. I'm by myself right this second. |
| MCCLELLAN | Yeah, I needed you to see this |
| MACKINS | Uh… Um… Yeah, just…I mean, just round up the troops if worse comes to worse. You know what I'm saying? |
| MCCLELLAN | Yeah, but it is, it is, it's um... Yeah. I, I, I'ma, I'ma I'ma...get my Android. I gotta go to my other house and get my Android. That, that, that Duo, that Duo be recording, though. |
| MACKINS | Oh, okay. I got you. |
| MCCLELLAN | That's why everybody's talking on the iPhones, 'cause it don't record. |
| MACKINS | Oh, that's crazy. |
| MCCLELLAN | Yeah. The Duo records, if you didn't know. |
| MACKINS | No, I didn't know that shit. What about that Whatsapp shit? |

| | |
|---|---|
| MCCLELLAN | It records. |
| MACKINS | Oh. |
| MCCLELLAN | The only they can't record is that, that iPhone. |
| MACKINS | That's crazy. |
| MCCLELLAN | Yeah, that's… Well, that's what the big thing is. They [U/I]. The police is saying Apple's allowing criminals to do [U/I] over the phone…And they're saying, we're not allowing people to do shit, but we're not gonna give y'all permission to violate the constitution, 'cause that's an invasion of privacy. |
| MACKINS | Yeah, that's crazy. |
| MCCLELLAN | But uh, yeah. The only issue is uh, the stuff wasn't what it was supposed to be. It started, it started molding. |
| MACKINS | Copy. |
| MCCLELLAN | You, you feel me? |
| MACKINS | yeah, yeah |
| MCCLELLAN | it was mold |
| MACKINS | yeah |
| MCCLELLAN | And, and, and, um... Some people got sick, and I'm like, "What the fuck is going on?" They was like, "Listen, we don't know what it is." |
| MACKINS | Copy |
| MCCLELLAN | So I'm like, what the fuck? |
| MACKINS | Yeah, yeah. Fuck. Definitely, yeah. Oh yeah, so yeah we all [Stammers] that's- Yeah, we uh, we definitely uh, you know what I'm saying? We all in the same [U/I], see what the fuck is what. We all [U/I] like that. |
| MCCLELLAN | Yeah. Yeah, so I'm gonna [U/I]. |
| MACKINS | [U/I] It's simple, really. It's simple. You know what I'm saying? It's simple. I would just ud, you know what I mean? I would just stop the press, fuck it, You know what I'm saying? [U/I] |
| MCCLELLAN | [U/I]. I don't, I don't know [U/I]. |
| MACKINS | So that's cool, I'll make sure I hit you. But I – You know what I'm saying? I'm riding |

| | |
|---|---|
| | with that, with that, with that and then-then we can holler. |
| MCCLELLAN | Yeah, because- |
| MACKINS | I'm gonna have to get a visual. But, but I got, but I have, I gotta definitely fill in these [U/I], man 'cause it's, you know what I'm saying? You know? I'm, I'm going through too many, too much feedback, know what I'm saying? |
| MCCLELLAN | Oh |
| MACKINS | Yeah, you know what I'm saying? That's crazy. |
| MCCLELLAN | You already know, you already know what I'm talking about. |
| MACKINS | Yeah, exactly but I got this different feedback on som-, [U/I] hold up, what the fuck? So yeah I'm um. Oh, we must have had a big accident. So you know, I'm gonna holler at, know what I'm saying? Like, what the fuck man? Bet it up. |
| MCCLELLAN | Yeah. Yeah 'cause uh, we got a good thing rolling. |
| MACKINS | Yeah, like what the fuck, man? |

24.    Based on training, experience, and knowledge, your affiant believes when MACKINS used the terminology, "round the troops up" MACKINS told MCCLELLAN to use more cutting agents to give the product a better appearance.  Investigators believe MCCLELLAN was letting MACKINS know that people are getting sick off the CDS MACKINS gave him. MCCLELLAN informed MACKINS that the "stuff", which investigators know to mean CDS, wasn't what it was supposed to be and started to mold. Investigators believe MCCLELLAN is referring to how the CDS provided by MACKINS has "molded" and appeared coagulated together. MACKINS told MCCLELLAN to "stop the press" MACKINS was telling MCCLELLAN to stop packing CDS for street level consumption. Additionally, MCCLELLAN wanted MACKINS to get an iPhone so MCCLELLAN could show MACKINS the moldy CDS. MACKINS informed MCCELLAN that he had been getting the same feedback from others and knows what the issue is

and will address it with his supplier. MACKINS told MCCLELLAN that he will get to an iPhone

as soon as he can, so MACKINS can see the CDS MCCLELLAN wanted to show him.

25.    On June 2, 2021, at approximately 7:10 p.m., MACKINS contacted MCCLELLAN

and the following is a portion of what was discussed:

| DIRECTION | CONTENT |
| --- | --- |
| MACKINS | (U/I) |
| MCCLELLAN | Trying to get the game plan together huh? |
| MACKINS | Yeah, Yeah, yeah, yeah, so yeah you know. I can't you know, I'm just gonna um, just uh, you know ah toss it whatever, you, you know what I'm saying? Trash, whatever you wanna do, do, know what I'm saying? |
| MCCLELLAN | What is he saying, like, like I don't, you know what I'm saying? |
| MACKINS | Nah, they don't, Nah he don't really, He just ca-he don't know. He making it sounds like damn, bro. You know what I'm saying? |
| MCCLELLAN | Yeah |
| MACKINS | Yeah, he was salt [ph], trying to figure something out though, whats his name[U/I] fuck it, [U/I], you what I mean and get on a whole other mission, you know what I'm saying, fuck it. |
| MCCLELLAN | Yeah, yeah but my whole thing is like what-what was he lining you up for? What was he Yeah, yeah but my whole thing is like what-what was he lining you up for? What was he |
| MACKINS | No, nah, it just uh, I would say that he just didn't I think he said that um, the uh, I remember when he was telling me this too. I-I think what he that when he was, yeah he said that, "do you remember, uh". He-he had, he was, he had something I |

|  | used, um, a machine that, he didn't know what it was. I literally didn't think that I [U/I] or knew what it was, you know what I'm saying? And just used it, and the it was just, it was just through black, some little black things that's always popping up and he kept having to take them out and I was there. So I'm like damn, but that's what happen, so that's why, he said it gotta be, that's the only thing he can possibly, I would think of, you know what I'm saying? |
|---|---|
| MCCLELLAN | Okay, he saying. |
| MACKINS | One minute |
| MCCLELLAN | See nothing is on and the other reason I say that is because when-when the people started telling me they was getting sick and going to the hospital. What if somebody would have gotten baited [ph]? |
| MACKINS | No I just |
| MCCLELLAN | You feel me? |
| MACKINS | Hold on one second |
| MCCLELLAN | Yeah |
| MACKINS | Hold on one second. [Background: DM talks to someone]. Yeah, yeah exactly but nah. |
| MCCLELLAN | Everybody got check mated you know? |
| MACKINS | That's a fact. But here is the thing though, I was, I was, I was on deck, for that. I was on deck, you know what I'm saying? So, I know that for a fact. I was literally on deck. |
| MCCLELLAN | Oh |
| MACKINS | You know what I mean? |
| MCCLELLAN | I understand now. |

| | |
|---|---|
| MACKINS | Yeah so. |
| MCCLELLAN | This ain't just no run of the mill nigga is he? |
| MACKINS | no, no, no |
| MCCLELLAN | (U/I) |
| MACKINS | No, question about it. I was on deck. |
| MCCLELLAN | Say no more |
| MACKINS | You know what I'm saying? |
| MCCLELLAN | Okay |
| MACKINS | That's why, that's why I was like nothing to even think about, you know what I'm saying? At all. |
| MCCLELLAN | Yeah |
| MACKINS | You know what I'm saying? It was like yo. |
| MCCLELLAN | Yeah |
| MACKINS | Alright, you what I'm saying? So I might [Stammers] for sure, [U/I] we not [U/I] on a hen just to come, you know what i'm saying? They ain't doing that. |
| MCCLELLAN | Right, right, right. |
| MACKINS | Not doing that fuck that man. |
| MCCLELLAN | Doesn't wanna waste my time or yours. |
| MACKINS | You know what I'm saying? |
| MCCLELLAN | (U/I) |
| MACKINS | [Aside: Oh yes, I'm ready] Hold on one second big homie. |
| MCCLELLAN | Yeah. Just hit me back. Just hit me back get situated and hit me back. |

26.     Based on training, experience, and knowledge, your affiant believes that in the

above conversation MCCLELLAN and MACKINS were discussing the bad batch of CDS MACKINS gave MCCLELLAN that is causing MCCLELLAN's customers to get sick. MCCLELLAN asked, "What is he saying, like, like I don't, you know what I'm saying?" and MACKINS responded, "Nah, they don't, Nah he don't really, He just ca-he don't know. He making it sounds like damn, bro. You know what I'm saying?" Based on training, experience, and knowledge, investigators believe MCCLELLAN asked MACKINS if the "cook" or person who manufactured the CDS had a solution and MACKINS responded telling MCCLELLAN that the "cook" is not sure what is wrong with the CDS. Later in the conversation, MCCLELLAN told MACKINS, "Everybody got check mated you know?" and MACKINS responded, "That's a fact. But here is the thing though, I was, I was, I was on deck, for that. I was on deck, you know what I'm saying? So, I know that for a fact. I was literally on deck." MCCLELLAN then asked MACKINS, "This ain't just no run of the mill nigga is he?" and MACKINS responded, "no, no, no". Based on training, experience, and knowledge, investigators believe MCCLELLAN was asking MACKINS if his CDS manufacturer/source of supply had been vetted by MACKINS and was not just a random guy. MACKINS assured MCCLELLAN that the CDS manufacturer/source of supply was not random and that MACKINS was there when the CDS was being manufactured.

27. On June 3, 2021, at approximately 10:13 p.m., MACKINS sent an outgoing text message to MCCLELLAN, "Peace comrade didn't forget about you working on a solution now to link up with you this week". MCCLELLAN responded, "Ok".

28. Based on training, experience, and knowledge, your affiant believes MACKINS was reassuring MCCLELLAN that MACKINS was working on fixing the issue with the CDS so the two would be able to meet that week to conduct another CDS transaction.

29.     On June 4, 2021, investigators and a K-9[7] partner conducted a scan of the TARGET VEHICLE for the presence of narcotic odor. At the time of the scan, the TARGET VEHCLE was located in the 1100 block of East Northern Parkway, Baltimore, MD. Investigators have previously observed the TARGET VEHICLE, another Ford truck and two trailers, belonging to MACKINS, parked on East Northern Parkway. This section of East Northern Parkway is approximately 1.5 miles from the GITTINGS PREMISES. Investigators have previously observed MACKINS vehicles parked along that portion of East Northern Parkway.

30.     On June 8, 2021, at approximately 1:24 p.m., MACKINS contacted MCCLELLAN and the following is a portion of what was discussed:

| DIRECTION | CONTENT |
|---|---|
| MCCLELLAN | Yo |
| MACKINS | Yo, What's up, boy |
| MCCLELLAN | Yeah, what's popping, my boy? |
| MACKINS | You, man. That shit had me shook for a minute and I'm like, the fuck. Man like, the fuck. |
| MCCLELLAN | Yeah, I've been busy. No. I was getting ready to get on the highway and my motherfucking car broke down. |
| MACKINS | Okay |
| MCCLELLAN | Yeah, what's up, though? Ah, tell me you got some good news. |
| MACKINS | Yeah, I, I um-, [Stutters] you remember the first time you saw me, right? |

---

[7] K-9 Echo is trained to alert on heroin, tar heroin, and cocaine. K-9 Echo has been proven to be reliable in the past and, is up to date on all K-9 certifications, with his most recent certification in April 2021.

MCCLELLAN                       Yeah

MACKINS                         Right. I, I always have that available,
                                right? But I been trying to wait on dude,
                                you know what I'm saying? To um, to see
                                a new doctor to see what the fuck is going
                                on, right?
MCCLELLAN                       Yeah

MACKINS                         And that's what I was waiting on, so I
                                said, I'm like yo, I don't wanna keep
                                making myself wait. So I'm like yo,
                                maybe I missed some, you know what I'm
                                saying, something so he can be able to be
                                alright. You know what I'm saying?
                                That's so we can, you know what I'm
                                saying?
MCCLELLAN                       Yeah

MACKINS                         You-you following me?

MCCLELLAN                       Yeah, I'm with you.

MACKINS                         Yeah, 'cause I, I don't-, you know what
                                I'm saying? 'Cause I don't have- [Stutters]
                                I don't have control over it. You know
                                what I'm saying? [U/I]
MCCLELLAN                       Right, I know

MACKINS                         So, that's the only thing about it. [Stutters]
                                But I, I- You know what I'm saying? I
                                know, I know what, what, what I did at.
                                You know what I'm saying? So I said let
                                me, let me just have [U/I] fuck it.
MCCLELLAN                       (U/I)

MACKINS                         You know what I'm saying? I um, I would
                                rather just, so he can keep himself going
                                and be in position. You know?
MCCLELLAN                       Right, right. To get in a better position.

MACKINS                         Right, to get in a be, exactly. You know
                                what I'm saying? It's that better position
                                coming into play. Because, because um,
                                nobody understands, nobody understood

18

|  |  |
|---|---|
|  | that bro. I was like no. You know what I'm saying? |
| MCCLELLAN | Yeah |
| MACKINS | And you know what I mean, these motherfuckers up, you know, you know? And ain't nobody going all the way out there. |
| MCCLELLAN | Right |
| MACKINS | So yeah, so it's like, you know.  So yeah, so it's like, you know. [U/I], you know there that's the only thing that's aggravating because, you know what I'm saying? You know it's like, how the fuck do we, do you know what I mean? I mean, they sent the word, but you don't see me, me just talking whatever, you know what I'm saying? See me, me just talking whatever, you know what I'm saying? |
| MCCLELLAN | Right |
| MACKINS | Yeah. You know what I'm saying? It's not making sense. But see what happens, and it takes for something to happen, for us to think about this now. You know what I'm saying? We, we should have been thought about for, forreal. |
| MCCLELLAN | Right. Right. Right, they need, they to put that one, the one ingredient back in it. |
| MACKINS | You know I'm saying. You know know what I'm saying now? |
| MCCLELLAN | Tell him, tell him to do that and we can go hard with that |
| MACKINS | Yeah, yeah. Exactly. You know what I'm saying? And see what the fuck is what man, 'cause I said I'd meet him, I said I'd meet him in a frenzy, bro. [Stammers] And the last one I like to leave is my m-, is my motherfucking partner hanging, fuck that |
| MCCLELLAN | Alright. cool. Keep me in the loop. I love you boy, [U/I]. |
| MACKINS | Got you. Love you, love you too, boy |

31.    Based on training, experience, and knowledge, your affiant believes that in the above conversation, MACKINS was telling MCCLELLAN that he used to always have CDS available, but he is trying to wait on his supplier who is attempting to resolve the bad mix that is causing MCCLELLAN's customers to get sick.  Specifically, when he stated, "Right. I, I always have that available, right? But I been trying to wait on dude, you know what I'm saying? To um, to see a new doctor to see what the fuck is going on, right?" he was referring to a new product. Based on training, experience, and knowledge, investigators believe that when MACKINS told MCCLELLAN "they sent word," MACKINS was letting MCCLELLAN know the manufacturer told their boss about the CDS issue so it can be fixed.  When MCCLELLAN told MACKINS, "they need, they to put that one, the one ingredient back in it. Tell him, tell him to do that and we can go hard with that," MCCLELLAN was telling MACKINS to have them add the cutting adulterant they removed back into the CDS and then they can get back to distributing drugs.

32.    Between May 2021 and July 2021, utilizing court authorized GPS tracker and cellular pings, investigators observed MACKINS utilizing the TARGET VEHICLE to travel to New Jersey, New York, and Virginia at least once a week and at times twice a week. Based on the GPS tracker data, investigators learned that when MACKINS returned to the Baltimore area, he would often stop and stay the night at EUTAW PREMISES. Based on surveillance between June 5-25, 2021, MACKINS has been observed exiting the TARGET VEHICLE and carrying a duffle bag similar to the one seen on June 10, 2021 into and out of EUTAW PREMISES.

33.    For example, on June 11, 2021, at approximately 4:02 a.m., based on security footage provided by CenterPoint Apartments, MACKINS was observed entering the front door of EUTAW PREMISES carrying a grey and black duffle bag. On June 16, 2021 at approximately

10:02 a.m, based on security footage provided by CenterPoint Apartments, MACKINS was observed walking down the second-floor stairwell of EUTAW PREMISES carrying a large grey and black duffle bag. On June 17, 2021, at approximately 9:40 a.m, based on security footage provided by CenterPoint Apartments, MACKINS was observed walking down the second-floor stairwell and exits EUTAW PREMISES.

34.     Investigators learned based on Baltimore Gas and Electric Company information, that Jeneen Hawkins is the leaseholder at EUTAW PREMISES.  Since this location is not believed to be their residence, this location is believed to be a possible stash location for MACKINS.  Your affiant knows based on my training, knowledge, and experience, that drug traffickers often store their drug supply in other locations outside of their residence.  Additionally, your affiant also knows that drug traffickers often use the names of either an alias or their spouses/significant other to rent a location to avoid detection by law enforcement.

35.     On June 10, 2021, at approximately 9:48 a.m., investigators observed MACKINS exit GITTINGS PREMISES and enter TARGET VEHICLE.  MACKINS was seen carrying a black and grey duffel bag and once seated inside TARGET VEHICLE, investigators observed MACKINS holding a license plate with the inscription - War of 1812 and investigators observed the partial tag number-63567. Investigators have observed MACKINS carrying a similar duffle bag to and from his residence, and to a possible stash location after making trips to New Jersey, New York and Virginia.  Given his frequent trips to these areas as well as the SUBJECT PREMISES, your affiant believes that MACKINS uses the duffle bag to transport CDS and/or drug trafficking proceeds. Your affiant knows through training and experience that it is common for drug traffickers to transport CDS in bags, such as duffel bags. Your affiant also knows that drug traffickers are also known to swap vehicle tags to elude law enforcement detection.  Based

on knowledge, training, and experience, investigators know that drug traffickers often separate their drug proceeds from their CDS and store them in different locations.

36.    During the month of June 2021, investigators observed, on multiple occasions, MACKINS enter 11 N. Eutaw Street, Apt 204, (hereinafter referred to as the "EUTAW PREMISES") carrying a grey and black duffle bag. MACKINS is also observed exiting EUTAW PREMISES via the second-floor stairwell carrying a large grey and black duffle bag. Jeneen MACKINS was also observed entering and exiting EUTAW PREMISES.

37.    On June 29, 2021, investigators, and a K-9[8] partner conducted a scan of the door at EUTAW PREMISES for the presence of narcotic odor.  At the time of the scan, K-9 partner conducted a sweep of three apartment doors, including EUTAW PREMISES. Upon conducting the scan, K-9 partner alerted to the presence of illegal drug odor along the bottom of apartment door "E204", EUTAW PREMISES.  The K-9 did not alert at any of the other doors.

38.    On July 24, 2021, at approximately 8:42 a.m., MACKINS sent an outgoing text message to MCCLELLAN, "Touch down! comrade". MCCLELLAN responded, "Gm". MACKINS texted MCCLELLAN, "All is well", to which MCCLELLAN responded, "ok, fill me in later". MACKINS affirmed, "okay".

39.    Based on training, knowledge, and experience, your affiant believes that in the above conversation, MACKINS was telling MCCLELLAN that he has fixed the issue with the CDS when he sent the text message, "Touch down ! comrade".

40.    Based on court authorized GPS tracker and cellular ping data, investigators know

---

[8] K-9 Ruger is trained to alert on marijuana, heroin, and cocaine. K-9 Ruger has been proven to be reliable in the past and is up to date on all K-9 certifications, with his certification in February 2021.

that MACKINS was in New York when the above communication occurred. Additionally, MACKINS was utilizing TARGET VEHICLE and returned to GITTINGS PREMISES after the trip to New York. The following day, July 25, 2021, at approximately 11:30 a.m., MACKINS departed GITTINGS PREMISES in a white Ford Truck with Virginia registration, VA, 7400UJ. Based on a Department of Motor Vehicle search, this vehicle is registered to MACKINS. At approximately 4:17 p.m. that same day, MACKINS arrived at EUTAW PREMISES.

41.    Based on training, knowledge, and experience, investigators know that it is common for drug traffickers to use multiple vehicles to elude law enforcement detection. Investigators believe MACKINS switched vehicles is utilizing multiple vehicles in furtherance of his drug trafficking business.

42.    On July 28, 2021, at approximately 12:33 p.m., MACKINS sent an outgoing text message to MCCLELLAN and the following is a portion of what was discussed:

| DIRECTION | CONTENT |
|---|---|
| MACKINS | Comrade need to see when we can link up |
| MCCLELLAN | ok, Ga Gm bro |
| MACKINS | Hey is this week or this weekend best for you comrade? |
| MCCLELLAN | Not this weekend Monday Tuesday |
| MACKINS | What about this weekend bro |
| MCCLELLAN | Let's try Wednesday |
| MACKINS | Okay, cool |

43.    Based on training, experience, and knowledge, your affiant believes that in the

above conversation, MACKINS, was telling MCCLELLAN they need to set a date/time to meet up to conduct the CDS transaction when MACKINS stated, "Comrade need to see when we can link". MCCLELLAN and MACKINS agreed on a day when MCCLELLAN stated, "Let's try Wednesday" and MACKINS stated, "Okay, cool".

44.     On July 28, 2021, MACKINS utilizing TARGET VEHICLE departed the GITTINGS PREMISES and drove to New York. Upon MACKINS return to Maryland, MACKINS went to the GITTINGS PREMISES.

45.     On August 17, 2021, DEA Pittsburgh notified DEA Baltimore that MCLLELAN and MACKINS had an unmonitored[9] twenty-minute conversation on August 12, 2021.  On August 17, 2021, DEA Pittsburgh advised DEA Baltimore that MCCLELLAN sent an outgoing text to a girlfriend stating that MCCLELLAN "messed up the batch and needed to get a new one quick". Based on knowledge, training, and experience, investigators know that MCCLELLAN was referring to messing up mixing the CDS when he stated he "messed up the batch."

46.     Later that same day, based on a court authorized GPS cellular ping data, investigators observed MCCLELLAN's phone travel to Baltimore, MD. At approximately, 3:00 p.m. that same day, investigators observed MACKINS and MCCLELLAN meet near a Tiger Mart[10] in Baltimore, MD and enter an unknown building. Investigators identified the vehicle MACKINS was driving as a red Hyundai bearing Virginia registration, UJP-8465. Based on law enforcement databases, the vehicle is registered to JDM Transport LLC. Based on these observation, investigators believe MACKINS and MCCLELLAN were consummating a CDS

---

[9] DEA Pittsburgh has a court authorized T-III wiretap on MCCLELLAN. On August 12, 2021, bad weather caused the interception to fail and only data was received.
[10] This Tiger Mart is the same location MACKINS and MCCLELLAN met previously to conduct a CDS transaction.

transaction inside of an establishment to avoid law enforcement detection.

47.     On August 26, 2021, investigators executed federal search warrants for David

MACKINS, the GITTINGS PREMISES, the EUTAW PREMISES, and the TARGET VEHICLE.

     a.   During the search of the GITTINGS PREMISES, investigators located and
        detained MACKINS and seized the following items:

           i.   $39,000.00 U.S currency, seized from inside a TV stand, located in the
              basement.  The $39,000.00 was located after a K-9 alerted to the odor of
              CDS at the right door of the basement TV stand, where David MACKINS
              stated the U.S. currency was located. The currency was bundled with rubber
              bands and organized by denomination, consistent with the manner in which
              drug proceeds are often stored and hidden.

          ii.   A silver in color Samsung cell phone with passcode "5411" located in 1st
              floor living room

         iii.   A black in color Taurus G2 handgun S/N "TKM43983" located in 1st floor
              closet.

48.     On September 16, 2021, investigators executed a federal arrest warrant for

MCCLELAN and federal search warrant for his residence located at 2310 Surrey Lane, Apt 64,

Elizabeth, PA.

### Criminal History of Narcotics Offenses

49.     MACKINS has a criminal history to include, Conspiracy to Distribute Narcotics,

Conspiracy to Distribute and Possession with the Intent to Distribute Crack Cocaine, and Criminal

Possession of a Dangerous Weapon 1st Degree.

### Wage and Employment Records

50.     MACKINS had no known employment at the time of the search and seizure warrant

was executed. The Maryland Automated Benefits Wage History Inquiry for MACKINS did not

contain any wage history. The Virginia Automated Benefits Wage History Inquiry for MACKINS

did not contain any wage history.

**Conclusion**

51.    The evidence in this declaration provides a reasonable basis to believe, and I do

believe, that the $39,000 recovered from the GITTINGS PREMISES constitutes (1) moneys

furnished or intended to be furnished in exchange for a controlled substance in violation of the

Controlled Substances Act; (2) proceeds traceable to such an exchange; (3) moneys used or

intended to be used to facilitate a violation of the Controlled Substances Act and is subject to

forfeiture under 21 U.S.C. § 881(a)(6).


I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO TITLE 28 U.S.C. § 1746
THAT THE FACTS SUBMITTED BY THE BALTIMORE CITY POLICE DEPARTMENT, IN
REFERENCE TO THE SEIZURE OF U.S. CURRENCY, CELLPHONE, AND TAURUS
HANDGUN, FROM DAVID MACKINS ARE ACCURATE, TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.


*SA Khrystina Pindle*
_____
Khrystina Pindle
Special Agent
Drug Enforcement Administration